Good morning, may it please the court. In its closing, the prosecution referred, on at least five occasions, to a murder weapon. It pointed to a gun. That gun was found inside a pocket, in a jacket, in a closet, in Mr. Casey's bedroom. There was no search warrant. Mr. Casey did not consent to the search of his bedroom. He was never asked. The prosecution relies on consent from the joint authority or common authority doctrine, established initially in Matlock. Because it seeks to apply an exception to the Fourth Amendment, it has the burden to show that the area to be searched was one subject to mutual use by persons having joint access or control, for most purposes, of the common area. That language is Matlock. That is the standard from which the implied authority and all of the other cases flow. The grandfather, as I understand it, told the investigators that he, the grandfather, owned the house. That's correct, there's no dispute. And that your client lived in one of the bedrooms. That's correct. That the door was not locked. That's disputed. Well, this is what I'm asking you, what the grandfather told the investigators when they asked him. There is controversy about that in the record, your honor. I understand that. I understand that the grandfather took the stand at the trial and testified differently. I'm asking you now, what the investigators learned when they asked questions. And that was that the grandfather owned the house, it was a bedroom in the house, the door was not locked, and that the grandfather had access to the room. Is all of that correct? Your honor, on the record, there are two versions of that conversation. Is it difficult for you to respond with a yes or no? Yes, it's difficult, your honor, for this reason. There was, your honor is correct, that there was testimony to that effect by some of the agents. Your honor is correct that there was contrary testimony by the grandfather, but there was an agent who testified consistently with the grandfather and said that Mr. Rivera said that no one else had access, that he understood that no one else was allowed to go in that room. So there's conflict about that on the record, that's all I'm saying, that's why it's difficult. And it's not just from Mr. Rivera. And that exchange is cited in my brief. Do the cases, MADLOCK and its progeny, require investigators to cross-examine a building owner with respect to common areas? No, they don't, your honor, but what I think is important here is the concept of common areas. And I submit that an adult employed living in the home of other adults does not use his bedroom as a common area. That the property owners are entirely authorized to invite the police to search the common area. That was not the interest here. The interest was in Mr. Casey's bedroom, and that is not a common area. That is the essence of my argument, that Mr. Casey's bedroom is a separate area, and the only reasonable expectation of privacy that one can have is that one's bedroom or a room that's been designated even for an overnight guest to stay in is not a common area. Just so I understand the limits of your argument, in the suppression ruling by the district court, he says, this is a finding, and I know you may contest the finding, but I want to understand, assuming the finding is correct, what your legal position is, although the defendant was the only person who used the bedroom which was searched, there was no lock on the door and both Rivera and Mrs. Rivera entered the room regularly. That's a finding in the suppression ruling. Assume that's correct. I know you might want to contest it. Assuming it's correct, if that's true, what's your legal position about whether there was authority to go in? There was no authority to go in. Even if they enter it regularly? Correct. Because it's not a common area. There was no indicia of mutual use. They went into the closet. I understand. That's great. They went into the jacket. But that, just to be clear, on appeal to us, your argument is only challenging the consent to go into the room, not the closet and the jacket. Well, of course the closet and the jacket as well as the room. Well, I know you'd maybe like to, I don't see in your brief, did you preserve that argument to us? It was part of the room, Your Honor. Well, it's not. It's a distinct part of the room. It was not separately argued below. I believe that it was inherent in my brief. This was not the bedroom. Nothing in the bedroom was a common area. Okay. Then that means the objection is to going into the whole room. Put aside the jacket and the closet for a second. I understand that argument. Assume just for a second the gun is just in the room. You're objecting to even going into the room. Yes, Your Honor. Okay. And what I want to know is why, if in fact Rivera and Mrs. Rivera entered the room regularly, there would be a reason to think that they don't have authority to allow the police to go in there. Because they didn't use it. It was not a common area. If you're in a room regularly, how are you not using it? There are cases in which someone goes in to announce supper is ready. There is no storage of belongings there. I think that's a very significant element of use in a Fourth Amendment context. It's clear that there's an individual who retreats to that place for his or her most private activities. So I guess the difference is on a parent authority. This is to the question of how deep the officer has to go when they are trying to get consent or see if they have consent. If the parents say we go in there all the time, you'd say that's not enough? You'd have to say do you store stuff there? If it's a minor child, Your Honor. No, no, an adult child. It's a different. It's an adult child. The parents say to the police officers we go in his room all the time. That's not enough? I think children are different, Your Honor. Adult, adult. I know, but this was not. Adult grandson. All right. We try to figure out what you think the police have to ask. Your Honor, the question here is not a parent authority. The police knew exactly what they wanted to do. They wanted to go into Mr. Casey's bedroom. They knew it was not a common area. A parent authority supports a reasonable but mistaken belief that it is a common area. Here we simply don't have a reasonable belief. But before you get to a parent authority, we're trying to figure out. The police asked a series of questions that it may be disputed, but they asked questions and the district court found that they regularly went into and used the room. So we're trying to figure out what more you would have wanted the police to ask of the grandparents for you to concede that they had authority. What use do you make of this room? Do you store things here? Are the belongings here yours? Your Honor. You would never ask that question if it were a minor child. No, I would not. And a parent gave consent, would you? No, of course not. But we have someone the police knew that Mr. Casey was working. They knew he had an income. And, Your Honor, there is a dispute. And I submit that the district court completely ignored the testimony of the agent, who I cite on page 12 of my reply brief, where the agent is asked, and he also made it very clear that that bedroom was belonging to LeSean Casey, right? Nobody else slept in that bedroom. No. Nobody else kept property in that bedroom. No. Nobody else used that bedroom. No. And that agent said that Mr. Rivera told them that the grandparents were not allowed to go into the room. So there is also a conflict in the record from the prosecution's witnesses. The district court simply ignored that testimony on the record. We've asked you a lot of questions about this. Did you want to cover other issues? I certainly do, Your Honor. I would also like to discuss the issue. I'd be delighted. And that is, under what theory of exceptions to the hearsay rule did the district court have authority to allow an expert who didn't prepare a report to verify its authenticity? None, Your Honor. And that report was also cited in closing. And they waived the $20 bill with Liz Hardy's DNA on it. And they said, this shows that Mr. Casey was the person who drove out of the parking lot on the morning of the murder. And I submit, I know the court is concerned about standards of review, but this is an absolutely classic bull-combing Melendez Diaz error, and it is totally clear on the record. The reason there was no objection, I submit, is that the prosecution promised, when the defense initially filed a motion to exclude that, to provide a witness who had sufficient knowledge and experience to be able to present that report because it had a relationship to the testing or had redone it or something. But that was patently clear following direct examination of the expert that was actually produced, right? Correct. Correct, Your Honor. And there was no objection at that point? No, Your Honor. That could not have been a strategic or tactical decision. There is no way that could have helped the defendant. The prosecution will say it did, they made the best of a very bad situation, but that was simply trial fatigue, Your Honor. That's the only thing that can explain that. To unplay an error on that issue. Yes. The thing that I'm having trouble figuring out, maybe you can help me with it, let's just say there is clearly a forthcoming error, and then we're trying to figure out whether it's material, whether it's prejudicial. The expert who actually testified, there was a prior promise, as you say, that the person who's going to testify is somebody who was in a position to do the testing. Correct. Her testimony is not a model of clarity. It sure is not. But that just leads me to think, why isn't that a problem for the defendant? In the sense that, given the prior background, which is, you've promised you're going to put somebody who can effectively replicate the testing, did it themselves. Then somebody testifies where it's unclear exactly what she's saying, whether she did it herself or not. Then there's no objection. Why shouldn't we or don't we have to read that as basically an acceptance that she basically was just saying, I did the test myself? Because, Your Honor, I think careful reading shows she clearly did not say that, and she said she was not employed at that lab for three additional years. She said, I wrote two reports, and she submitted three. She never testified. She said she read Blakely's report and agreed with its conclusions, but she had no idea what went into the report, whether the sample was contaminated. She had no relation whatsoever to the data. Well, didn't the defense attorney bring all of that up on cross, though, so that I'm having trouble trying to figure out why we shouldn't conclude it was strategic? It was not strategic, Your Honor. It was, as Judge Barron says, her testimony was very hard to understand, and sitting there waiting for something to come out with the expectation that she was going to have some relation to it. But a good cross-examiner might look at that testimony and through cross-examination undermine the credibility of that witness and therefore use that as a starting point to poke holes in the rest of the government's case. It did not go that way, Your Honor, and I do not believe that the defense did or could have made strategic use of allowing in the $20 bill with Mr. Lizardi's DNA on it that was, again, cited in closing. Unless defense counsel was worried that if they probed harder, maybe it turned out she had done the testing. No, Your Honor. She was three years away from the office when it was done, and her testimony doesn't remotely suggest that she was involved in that. When you say she was three years away from the office, I'm not following the significance of that. She was first employed by the FBI DNA Lab three years after the report was rendered. But she couldn't have done a retest of it? There's no evidence to suggest that whatsoever. Is there anything saying she couldn't have done it? She certainly didn't. I don't know if she could have, but there's no reason to believe that she did. Did the government offer any reason for the unavailability of the expert that actually produced the report? No, never, Your Honor. I would simply like to say — Before you go on to the next, just on the prejudice that followed from the bull coming, if we disagreed with you on the search, so all the material in the bedroom came in, given all the other evidence that would then be there to show guilt, would the bull coming error still require reversal? I believe so, Your Honor, because of the relevance of that $20 bill being handed to the parking lot attendant. I submit on my brief the issue about the cross-racial identification extraordinarily weak. That $20 bill is the only evidence that shows that Mr. Casey was in contact with Mr. Lizardi hours or minutes after he was murdered. Thank you. I place the court. Good morning. Good morning. Assistant United States Attorney, Mariana Balsaf of the United States. I would like to start with the last issue that was discussed before, Your Honors, which is the confrontation clause challenge. The government argued in its brief that that claim by defense was waived and that that was a strategic move by the defense to waive any challenge to the admitted report. This is Government Senate 48. As of January of 2013 — Why would somebody do that? Introduce the report. Why would somebody waive a challenge like that intentionally? Yes, Your Honor, because the defense had already announced prior to Karnemeyer taking the stand that it was important for the jury to know, and this was their case, when they tried to introduce the logs from the search, for the jury to see all the items that were seized, not just the ones that were selectively tested by the United States. That report, Exhibit 48, that was written by Brennan Shea, documented all the cues, all the samples that were retrieved by the FBI and sent by the lab, so that they can then challenge what the government selectively chose to test, focusing on LeSean Casey and not on Alexander Anandes. That's crazy. I'm sorry. That's just crazy. It may very well be, Your Honor, but that was a defense theory at trial, and that's why they would waive a challenge to the report. Do they argue that in closing? Do they argue the report? The selectivity of the government. Yes, Your Honor. They argued it at all times. In fact, from opening, they say it is uncontested that LeSean Casey drove out of the parking lot, that no time, question, or contest, and they even state this, the DNA. What they wanted to challenge, and they do from opening to closing, is the government's tunnel vision in its investigation of LeSean Casey, ignoring the fact that on August 1st, Lazzardi was to go with Casey to meet Alexander Anandes. So at all times, they wanted to introduce all the evidence that was seized, they even introduced the search warrant of Alexander Anandes' home, to show that the government had reason to suspect Alexander Anandes and just failed to follow up on that. It was a strategic move because this was something that was important to them, and they knew before Karna Meyer took the stand, and we had provided, and that's part of the docket, her peer review certification, which informed the defense that she had actually reviewed all the data, even though she came three years later. She says, I can rely on it because the lab has quality assurance measures that allow me to trust the materials that are here. She reviewed the data, all the reports done by the biologists, not even Brandon Shea, the biologist and the technician, and I reached my own independent analysis and my own independent conclusions, which were the same as Brandon Shea. Just on that point, if I understand you right, you're saying Shea himself did not do the test? Correct. She said the person that does the testing is the biologist, the technician. It wouldn't have been Brandon Shea. So what she did is identical to what Shea would have done? She did exactly what Brandon Shea had done. So that's why we understand it was a strategic move, knowing that there was no difference between Brandon Shea and her as to what they did to accept her testimony, because it allowed them to pursue what they believed to be the defense of the case. There's no challenge before us to the fact that the biologist has not been called? Correct. There is no challenge before you, Your Honors, and, in fact, the Court has mentioned even recently that experts can rely on information gathered by other persons or things that are not even admissible to reach their own conclusions and their expert opinion. Yeah, that's sort of the flip, though. The reason for that exception, and it ordinarily comes into play, when an expert is on the stand, the expert that's offering the opinion and is asked about the opinion of someone else, that's perfectly permissible. You know, I've only been doing this for 22, 23 years. I have never seen a case where an expert report is allowed into evidence based upon the testimony of somebody not involved in the preparation of the report. It's just inconceivable to me. Well, she was not involved in the preparation of the report. She wasn't even in the lab when it was prepared. Correct, Your Honor. But in terms of the claim before you, she had done her own. So there's two different matters. One thing is whether she could testify as to her conclusion and her analysis, and we should submit that she was not a surrogate witness, that she was actually qualified to testify as to her own independent analysis. And then the question of the report. She analyzed the underlying DNA material? Correct. She said, I performed my own analysis and interpretations and reached my own independent conclusions and associations. She didn't do the testing, though. Correct, but she didn't do the testing for Exhibits 49 and 50 either, which are the flip-flops and the car swabs, which were her own. She was the expert in the report. It's still the biologist that does the underlying work, and she reviews what the computer analysis prints out in the reports and reaches with that data her conclusions. What you're saying is she reviewed the biologist's report, not Shea's material. She reviewed the biologist's notes, not Shea's. And that's all Shea did. And that's all Shea did. And there's no challenge here to the fact that both Shea and this expert were analyzing a report that they never produced. Correct. There's no challenge to the biologist's work. In fact, there's no challenge to the DNA as a whole. There's no challenge to the absence of the biologist testifying about her testing. Correct. And, in fact, there's not only no challenge to that, but there's no challenge to the reliability and correctness of the conclusions regarding the DNA analysis as a whole. So the question before, Your Honors, if you decided it was not waived and plain error reapplied, there's no way to meet the third and fourth prong in this case. Why weren't the biologist in the prepare of the report called as witnesses? I would have to speculate as to why it was not done at the time. But essentially. I guess another way to ask the question, is there any evidence of record to explain the absence of those two individuals as witnesses? There was no request for them specifically. There was no challenge to the propriety of the expert testifying that would warrant the government turning around and calling an additional witness. It was never requested of the government to do that. But wasn't the defense told that the preparer of the report would testify as a witness? They were told. In January 2013, three months prior to trial. And that changed at trial? In January it was announced to be Karna Meyer. So that didn't change. The government ever explained to the judge why those individuals were unavailable? Brandon Shea, I believe, who was discussed in the motion practice, no longer worked at the FBI lab. So that had been discussed. And there was an issue with another expert that was going to be called that caused a challenge by the defense. The government promised a witness that was capable of discussing. And then when the government announced Karna Meyer, the government produced her peer review certification. Is it clear from the Shea report that he did not do the testing and the biologist did? I would have to look at the report and have that. How would one know that there's some other person not on any witness list who's actually the person who's done the test? Even if it were not in Shea's report, Your Honor, we did provide significant discovery in the case. And part of that included all the swabs and the testing. And that actually included all the notes from the biologist. And their names and their initials are throughout that. Because the cues are about 100 of them, each documented which were the underlying person examining that. And the way it works is the biologist produces a set of documents that then the expert reviews to make a determination of. And not just that, a computer, because it's computer data and printouts. And that's what the expert's looking at is the results that the computer is giving from the test that the biologist and the technician are conducting. And that's what they interpret to do all their DNA analysis and, lastly, do all their statistical computations. And even if it weren't clear from the report and all the government that gave a discovery, which I submit did when she took the stand, she said the biologist does the testing. And I just reached conclusions and interpretations of those results. I would like to address, if that answers the Court's questions on that issue, the other issue that was discussed before you, which is the search of the bedroom. The government's position is that right now counsel is conflating and confusing the standard in Matlock, making it a conjunctive test. She says use and control versus Matlock said use or control. The agent's questions to the grandparents were directed at the control. Do you have control and access to this bedroom? Do you have access to this bedroom? The grandfather said, yes, as owner of the property, I have access to this bedroom. I'm free to enter. My wife, Casey's grandmother, is free to enter and does, in fact, enter the bedroom. He said that? He said that. That she does enter it? That she does enter the bedroom. And that's the testimony of the agents. I can find the reference to the record. I thought they said they can come and go at will. She says that the grandmother regularly enters the bedroom. You can submit it if you want. I can submit that. How did the grandfather get to the police station? There was something in the record about him being intercepted on the highway and brought to the police station. I think he was originally stopped on the road. He was taken to the police station. That's where homicide detective Diana Marrero speaks to him. He is then brought to the home, and he's later talked to by FBI agents, and that was enough evidence. And in terms of that inconsistency with Agent Nazario, what he said was, I don't recall whether they have access to the bedroom. He recalled that Casey was the one that used the bedroom. But Villarreal, who is the one that provided the consent form that informed him of his right to refuse, did recall that he specifically stated that they had access to the bedroom and that the wife entered the bedroom. And even though Rivera testified differently at the suppression hearing, that his statements to the agents, he did testify consistently on one issue, which was that that day the door was unlocked, which is consistent with what he told the agents, what the agents saw, that the door was unlocked, and that there was no lock on the door. So that's an interesting inconsistency. Was the door open, or was there no lock on the door, or was there on that day the door was unlocked? On that day, what the grandfather testified at the suppression hearing was that it was unlocked. But there was a lock on the door. There was no – his testimony was at the suppression hearing that normally it is locked, but this day it is unlocked. What the agents testified is that the grandfather had said that the door was never locked, that it was always open. So it's not whether the door physically had a lock or not, but that the fact that the door was unlocked, and therefore they had easy access and control over the bedroom. Is there anything in the record that supports the finding that both Rivera and Mrs. Rivera entered the room regularly? It was the district court's opinion that they had access to the room, and it said at page 1574 of the appellant's appendix, there's testimony from Agent Villarreal that the door didn't have a lock and all had access, and it was their residence. The wife was free to enter, and the room had no lock. It's at page 1577. And what's the move from no lock, free to enter, to a finding that they both enter the room regularly? That seems to me not quite the same. Well, at page 1577, my understanding is that he told the agents, and Villarreal testifies, that the wife was free to enter the room. And that's just being interpreted as, in fact, they entered it regularly? I believe there was testimony, and I'm looking for the precise citation, that in addition to being able to enter, that they did actually enter the room regularly. Suppose we thought there was not evidence to support as a factual finding that they did, in fact, enter the room regularly. And suppose all we had instead was affirmative statements, at least the district court could credit, from the owners of the property, that they did have free access to the room. And I think they say at one point they could come and go at will. Not that they did, but that they believed they could. Would that be enough in your view? It would be enough in my view, not only that they had, because it's the disjunctive versus conjunctive. The fact that they did have access and they had control to the room gave them that actual authority. But in the event that even if they didn't, that the agents were free to believe at that point that they had apparent authority because what they're portraying to them was consistent that they did have access to the room and that they could come and go. And that's what distinguishes this case from the cases that the defense cited in the brief, where the parents in those cases either state, I don't have access to the room, or they weren't even asked if they had access to the room. So if someone owns a house, and they're giving access to a non-relative adult to a room that has a lock on it, it's reasonable to assume that for purposes of management they would have access. But that doesn't take you over the line to say that that would be enough, does it? But one thing is to say, do I have access? And the other one is, can I actually access? Am I actually accessing because I'm breaking this lock? But landlords always have access to rental property. So it can't just be that they have access. Correct. So you'd have to look at the facts of the case and the understanding that they had between the parties. And here it's not a landlord-tenant relationship where it's not okay for your landlord to enter your bedroom or your private paid residence where you are paying a rent because that's a relationship you have with the landlord. We have a case scenario here where you have grandparents, a grandson that doesn't contribute financially, that doesn't pay rent, and the grandparents are the owner of the property. And they say, we do have access to the bedroom and can come into this bedroom. And that's what they're portraying to the agents. It's very different from a landlord relationship. If the grandson was paying $25 a week, would that make a difference? I think it would be one of the factors to be considered by the court in making a decision whether the agents, whether the grandparents had actual authority or apparent authority for the agents. Because my recollection is at trial they said that he did contribute on occasion. Not at trial. At the suppression hearing the grandfather said that he did contribute some of the weeks and if he couldn't one week it was okay. But that is different from what all the agents testified that he did. And all the agents testified consistently that LaShawn Casey didn't pay any rent or make any financial contributions. Did they ask the grandfather that? Yes. And their testimony and all the agents testified that he lived there for free and did not make contributions. Casey was or is married, right? He was not, I believe, married under law. He had a consensual partner that was Crisant Pena at the time. Pena. Yes. And she was with him at the police station at one point. She had gone to the police station and then she followed him to Sabah where the FBI was holding him and that's where she had that conversation with him. Does the record tell us whether Casey and Pena lived in that room together? There is no indication that Crisant Pena lived in there with him from the record. One way or the other? One way or the other. Okay. Thank you. Thank you, Your Honor.